IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CHASITY CONGIOUS, on behalf of Herself and as Mother and Next Friend of Z.C.H., Deceased.<br><br>Plaintiff,<br><br>v.<br><br>AARON IVY SHAW, DO,<br><br>Defendant. | Civil Action No. 4:22-cv-00092-O |

## SECOND AMENDED COMPLAINT

NOW COMES the Plaintiff, CHASITY CONGIOUS, on behalf of herself and as Mother and Next Friend of Z.C.H., deceased, by and through her counsel, SAMUELS & ASSOCIATES, LTD., THE LAW OFFICE OF JARRETT ADAMS, PLLC, and COMER LAW GROUP complaining of Defendant, AARON IVY SHAW, DO, states as follows:

### INTRODUCTION

1. On January 15, 2020, 21-year-old Chasity Congious, who suffers from developmental disabilities and was diagnosed with bipolar disorder and schizophrenia, was having a mental health crisis when her family called the police to have her involuntarily committed at JPS Hospital; instead, she was arrested and taken to the Tarrant County Jail.

2. During her five months at the Tarrant County Jail, Chasity did not have a single court date and her condition deteriorated to the point that when she gave birth

1

alone in her cell at the Tarrant County Jail to baby Z.C.H. she was almost entirely nonverbal.

3. According to Sheriff Bill Waybourn, Chasity was "severely mentally," "incommunicative," and "hadn't made a sound in weeks" at the time she gave birth, which he confirmed by personally visiting with her.

4. Z.C.H. suffered severe oxygen loss postpartum and for a week was kept alive solely through intensive support before it was removed on May 27, 2020.

5. This action is brought pursuant to the laws and the Constitution of the United States of America against Defendant AARON IVY SHAW, DO for his denial of medical care and his willful and wanton actions causing the tragic and unnecessary death of Z.C.H., and irreparable harm to her mother, Chasity.

## JURISDICTION AND VENUE

6. This action is brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

7. The Court has jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. §§ 1331 and 1343.

8. Venue is proper under 28 U.S.C. § 1391(b) because the Northern District of Texas is the judicial district where the constitutional rights violation suffered by Plaintiff occurred.

## PARTIES

9. Plaintiff, CHASITY CONGIOUS, ("Plaintiff" or "Chasity") is a citizen of the United States of America, who, at all times relevant, resided in Tarrant County,

2

Texas. Chasity is the mother of the decedent, Z.C.H. Chasity suffers from developmental disabilities and has been clinically diagnosed as schizophrenic. Z.C.H. died intestate, had no property, and Chasity is her only heir.

10.     Defendant, AARON IVY SHAW, DO, ("Defendant Shaw") was, at the time of this occurrence, the medical director at the Tarrant County Jail. Defendant Shaw engaged in the conduct complained of in the course and scope of his employment and under color of law. Defendant Shaw is sued in his individual capacity.

**FACTS**

11.     At all relevant times, Chasity was a 21-year-old woman with a history and diagnoses of schizoaffective disorder – bipolar type, psychosis, schizophrenia, mood disorder, hallucinations, delusions, suicidal ideations, prior suicide attempts and self-harm, anxiety disorder, adjustment disorder, intellectual disability, and a family history of mental health and behavioral disorders.

12.     At all relevant times, Chasity's mental health condition as set forth in the preceding paragraph was a mental impairment that substantially limited Chasity's major life activities, including, but not limited to, understanding and communicating.

13.     On or around May 19, 2019, Chasity was arrested and charged with a criminal offense.

14.     During the pendency of that case, Chasity's trial judge twice entered orders for her to be tested to determine whether she was competent to stand trial.

15.     Chasity was released prior to the delivery of the Judge's order and without receiving any assessment.

16. Despite never receiving any assessment, on or around December 16, 2019, Chasity pleaded guilty to the offense was sentenced to four years deferred prosecution and fine.

17. At this time, Chasity was approximately four months pregnant.

18. On or around January 12, 2020, Chasity was undergoing a mental health crisis.

19. As the family feared Chasity's episode might harm her child, they called the Fort Worth Police Department ("FWPD") for assistance in helping to calm her down.

20. Chasity was adequately soothed and no further intervention was required.

21. Chasity's condition continued to devolve.

**The Pretrial Detention of Chasity**

22. On or around January 15, 2020, Chasity's mental health crisis worsened to the point that she began to engage in behaviors that were likely to lead to self-harm.

23. Accordingly, the family once again called FWPD; this time to have Chasity, who was legally an adult, involuntarily committed at JPS Hospital.

24. Despite the family's request for medical assistance, Chasity was arrested.

25. Criminal charges were made against Chasity for the crime of causing injury to a minor.

26. As a result of these charges, Chasity was held at the Tarrant County Jail on a probation hold and was denied bond.

27. From the date of her confinement until her eventual release five months later, Chasity never had a single court date.

### The Denial of Medical Care to Chasity

28. Defendant Shaw was the medical director at the Tarrant County Jail ("TCJ") and was responsible for Chasity's medical care at the TCJ.

29. There is a TCJ registration form for Chasity's January 15, 2020 arrest.

30. The registration form indicated that Chasity answered "yes" to whether she had been diagnosed as having mental illness by a doctor or mental health provider.

31. The registration form indicated that Chasity answered "yes" to whether she was currently taking medications for mental illness.

32. The registration form indicated that Chasity answered "yes" to whether she had ever tried to kill herself.

33. TCJ staff referred Chasity for an assessment because she mentioned her previous suicide attempts and stated that she "doesn't want to be here anymore."

34. On January 16, 2020, Licensed Professional Counselor Shelli Magin ("Magin") conducted an assessment of Chasity.

35. Magin noted that Chasity had been previously assessed with bipolar disorder, adjustment disorder, intellectual disability, mood disorder, and schizoaffective disorder.

36. During the assessment, Chasity reported to Magin that she took medications, but was unable to identify the medications or the prescriber of the medications.

37. Despite the fact the Chasity was approximately five months pregnant, Chasity denied being pregnant to Magin.

38. Despite the fact that Chasity had been referred for the assessment for her history of suicide attempts and for suicidal ideation, Chasity denied ever considering suicide and denied prior suicide attempts to Magin.

39. During the assessment, Magin noted that Chasity was a poor historian with respect to her mental health in that she could not provide an accurate timeline of her events, treatment, medications, and prescribers.

40. Despite the fact that Chasity had suicidal ideation, a history of prior suicide attempts, and had significant mental health issues, Chasity was placed in a single cell at the TCJ segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

41. On January 20, 2020, Chasity was referred for counseling due to reports of active suicidal ideation.

42. Qualified Mental Health Professional Hilton Young ("Young") conducted a counseling session with Chasity on January 20, 2020.

43. Chasity told Young that she was feeling suicidal.

44. Despite the fact that Chasity reported being suicidal to Young, Chasity remained in a single cell at the TCJ segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

45. On January 21, 2020, Licensed Professional Counselor Phillip Riley ("Riley") met with Chasity.

46. Riley noted that Chasity's demeanor was odd, and her mood and affect were incongruent.

47. Despite the fact that Riley noted that Chasity's demeanor was odd, and her mood and affect were incongruent, Chasity remained in a single cell at the TCJ segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

48. On January 28, 2020, Riley attempted to meet with Chasity.

49. Chasity was nonverbal and did not speak to Riley.

50. Despite the fact that Chasity was nonverbal and would not speak to Riley, Chasity remained in a single cell at the TCJ segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

51. On February 6, 2020, Licensed Professional Counselor Namsoon Park ("Park") met with Chasity.

52. Park noted that Chasity had been pregnant for approximately five months, had a history of not taking care of herself, and had delusional thoughts.

53. Park discussed with Defendant Shaw about whether Chasity should remain in a single cell at the TCJ infirmary segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

54. Defendant Shaw approved Chasity remaining in a single cell at the TCJ infirmary segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

55. On February 11, 2020, Chasity was 24 weeks pregnant.

56. Chasity had an ultrasound on February 11, 2020 which showed no fetal anomalies with her baby.

57. On April 17, 2020, Park met with Chasity.

58. Chasity would not speak to Park and would not respond to Park's questions.

59. An infirmary nurse reported to Park that Chasity was 33 weeks pregnant.

60. Despite the fact that Chasity was 33 weeks pregnant and not speaking or responding to questions, Chasity remained in a single cell at the TCJ segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

61. On April 28, 2020, Chasity was 35 weeks pregnant.

62. Chasity had an ultrasound on April 28, 2020 which showed no fetal anomalies with her baby.

63. On May 1, 2020, Park met with Chasity.

64. An infirmary nurse reported to Park that Chasity might not understand what a contraction was and became agitated when an explanation was attempted.

65. Park learned that Chasity was pregnant for over 35 weeks.

66. Despite the fact that Chasity was over 35 weeks pregnant and might not understand when she was experiencing contractions, Chasity remained in a single cell at the TCJ segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

67. Chasity was 37 weeks pregnant on May 13, 2020.

68. At 37 weeks pregnant, Chasity could have gone into labor at any time and it would not have been a premature delivery.

69. Approximately one-quarter of all babies are born by the 37th week of pregnancy.

70. On May 13, 2020, Melanie Carter, MD conducted a routine obstetrics examination of Chasity and her baby.

71. During the examination, Dr. Carter noted that Chasity was not responding to questions.

72. During the examination, Dr. Carter noted that Chasity was unable to say whether she was in abdominal pain.

73. At the conclusion of the examination Dr. Carter recommended that Chasity have an induced labor because Chasity was unable to express her symptoms and may not recognize when she goes into labor.

74. Despite the fact that Chasity was 37 weeks pregnant which meant that she could go into labor at any time, and despite the fact that Chasity was unable to express her symptoms and would not recognize it if she was in labor, Chasity remained in her

single cell at the TJC segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision.

75. Defendant Shaw knew and approved of all mental health and medical care treatment provided to Chasity at the TCJ as set forth in the preceding paragraphs.

76. Defendant Shaw knew and approved of Chasity being in a single cell at the TJC segregated from staff and other inmates and where Chasity was not subject to constant round-the-clock care, monitoring, and supervision, despite her record of mental health and medical care treatment as set forth in the preceding paragraphs.

77. Defendant Shaw knew and approved of Chasity being in a single cell at the TJC segregated from staff and other inmates and where Chasity was not subject to constant around-the-clock care, monitoring, and supervision, despite the fact that Chasity was 37 weeks pregnant which meant that she could go into labor at any time, and despite the fact that Chasity was unable to express her symptoms and would not recognize it if she was in labor.

### The Birth and Death of Z.C.H.

78. Chasity required constant supervision due to her objectively serious medical conditions.

79. According to Sheriff Bill Waybourn, Chasity was "severely mentally," "incommunicative," and "hadn't made a sound in weeks" at the time she gave birth, which he confirmed by personally visiting with her.

80. On May 17, 2020 at 7:29 AM, prior to when Chasity gave birth, Defendant Shaw received an email which contained a daily report for inmates in the Female Infirmary at the TCJ.

81. With respect to Chasity, the daily report stated "took PM ENSURE but Refused Breakfast C/O ABD CRAMPS."

82. Defendant Shaw therefore knew and was on notice on the morning of May 17, 2020 at 7:29 AM – prior to when Chasity gave birth – that Chasity was complaining of abdominal cramps and was in abdominal pain.

83. Chasity's abdominal cramps on the morning she gave birth were uterine contractions from being in labor.

84. Defendant Shaw therefore knew and was on notice on the morning of May 17, 2020 at 7:29 AM – prior to when Chasity gave birth – that Chasity was in abdominal pain and was in labor.

85. Defendant Shaw also knew and was on notice on the morning of May 17, 2020 at 7:29 AM – prior to when Chasity gave birth – that Chasity may not understand what a contraction is and may not realize that she was in labor.

86. Defendant Shaw also knew and was on notice on the morning of May 17, 2020 at 7:29 AM – prior to when Chasity gave birth – that a newborn baby such as Z.C.H. needs immediate medical attention to survive.

87. Despite Defendant Shaw's knowledge and notice as set forth in the preceding paragraphs, Defendant Shaw took no action in response to receiving the

email on May 17, 2020 at 7:29 AM notifying him that Chasity was in abdominal pain and was in labor.

88. Defendant Shaw therefore ignored Chasity's complaint of abdominal pain, refused to treat Chasity and Z.C.H., intentionally treated Chasity and Z.C.H. incorrectly, and/or engaged in conduct demonstrating a wanton disregard for Chasity and Z.C.H.'s serious medical needs.

89. Because Defendant Shaw took no action in response to receiving the email on May 17, 2020 at 7:29 AM notifying him that Chasity was in abdominal pain and was in labor, Chasity gave birth to Z.C.H. alone in her cell and without any medical care.

90. Approximately an hour and 40 minutes after Defendant Shaw received the email notifying him that Chasity was in abdominal pain and was in labor, a TCJ employee observed blood on Chasity.

91. Paramedics rushed to Chasity's cell to assist in attending to Z.C.H. and Chasity; upon information and belief, Z.C.H.'s umbilical cord was wrapped around her neck and Chasity had lost a large amount of blood.

92. Certified Physician Assistant Young and nurse Penny Nogueira assessed Z.C.H.

93. Z.C.H. was not breathing and had a faint heartbeat.

94. At or around 9:36 AM, Z.C.H. was rushed to Cook Children's Hospital for care in an ambulance where doctors attempted to provide her with life-saving care.

95. At or around 9:55 AM, Chasity was taken in a second ambulance to JPS to undergo surgery to repair her body after she suffered a grade 3 perineal tear.

96. Chasity remained nonverbal from the time TCJ staff entered her cell through her transfer and treatment at the hospital.

97. Z.C.H. suffered severe hypoxic ischemic encephalopathy, which means her brain was severely damaged from a lack of oxygen likely due to the umbilical cord being wrapped around her neck.

98. As a result, Z.C.H. was unable to breathe on her own, remained comatose, and had no brain activity.

99. On May 21, 2020, Z.C.H. was baptized.

100. Ongoing tests confirmed that Z.C.H. was brain dead and her condition would not improve over time.

101. On May 26, 2020, a doctor at Cook Children's Hospital wrote a note to the TCJ, explaining Z.C.H.'s condition in a futile attempt that they might let Chasity see her daughter.

102. The request was denied.

103. Doctors ceased providing Z.C.H. with intensive support and on May 27, 2020, at 1:48 PM, she died.

104. If Chasity had not been denied medical care at the TCJ by Defendant Shaw when she went into labor, Z.C.H. would not have suffered severe hypoxic ischemic encephalopathy and would not have died.

105. The same day Z.C.H. died, the TCJ put Chasity on suicide watch.

106. Chasity's family requested that she be allowed compassionate release to attend the funeral of Z.C.H.

107. The request was denied.

108. On June 12, 2020, Z.C.H.'s funeral was held without her mother's presence.

109. Chasity never got a chance to see her daughter, let alone hold her.

### Chasity's Damages, Release from Jail, and Continuing Mental Health Treatment

110. Chasity suffered a third-degree perineal laceration, which required eight sutures to repair, during the delivery of Z.C.H.

111. Chasity developed postpartum depression and postpartum psychosis following the birth of Z.C.H.

112. Worse, Chasity stopped eating completely.

113. Chasity has been and is currently receiving mental health treatment and taking medication for her postpartum depression and postpartum psychosis.

114. On June 18, 2020, the state moved to voluntarily dismiss the charges that had been levied against her.

115. Chasity was released from the TCJ and taken to JPS Hospital for inpatient, round-the-clock care and treatment—the same institution the family had tried to have Chasity committed to when they originally called for assistance on January 15, 2020.

116. After months of intensive, inpatient treatment Chasity was released from JPS into the care of her mother.

117. Chasity still asks about Z.C.H. and when she will come back.

118. If Chasity and Z.C.H. had not been denied medical care at the TCJ by Defendant Shaw, Z.C.H. would not have died and Chasity would not have suffered postpartum depression and postpartum psychosis.

119. As a direct and proximate cause of the actions and inactions of Defendant Shaw, as set forth above, Chasity suffered bodily injury, pain and suffering, severe emotional distress, severe mental pain and anguish, humiliation, embarrassment, fear, loss of dignity, and interference with the ability to live a normal life.

120. As a direct and proximate cause of the actions and inactions of Defendant Shaw, as set forth above, Chasity suffered the loss of relationship, society, and companionship of Z.C.H.

121. As a direct and proximate cause of the actions and inactions of Defendant Shaw, as set forth above, Z.C.H. suffered bodily injury, pain and suffering, and death.

122. The conduct of Defendant Shaw, as set forth above, was motivated by malice, evil motive, and/or evil intent, and involved a reckless or callous indifference and/or disregard to Chasity and Z.C.H.'s federally protected rights.

### COUNT I: Denial of Medical Care
**Against Defendant Shaw**

123. Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set forth here.

124. Defendant Shaw had notice of Chasity and Z.C.H.'s objectively serious medical conditions.

125. Defendant Shaw knew and was aware of the substantial risk of medical harm to Chasity and Z.C.H.

126. Defendant Shaw disregarded the risks to Chasity and Z.C.H. by failing to take reasonable measures to abate them.

127. Defendant Shaw acted under color of law.

128. The denial of medical care by Defendant Shaw violated Chasity and Z.C.H.'s Fourteenth Amendment rights.

129. The denial of medical care to Chasity and Z.C.H. by Defendant Shaw proximately caused injuries and damages to Chasity and Z.C.H., as set forth above.

## CONDITIONS PRECEDENT

130. Plaintiff reserves her right to plead and prove damages to which she is entitled to at the time of trial. All conditions to Plaintiff's recovery have been performed or have occurred.

## REQUEST FOR RELIEF

WHEREFORE the Plaintiff, CHASITY CONGIOUS, on behalf of herself and as Mother and Next Friend of Z.C.H., deceased, respectfully requests that this Honorable Court enter judgment in her favor and against Defendant, AARON IVY SHAW, DO for actual, compensatory, exemplary, and punitive damages; pre-judgment interest at the maximum rate allowed by law and post-judgment interest pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law; reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law; unliquidated damages in an amount that is within the jurisdictional limits of the Court; and any such other and further relief that the Court deems equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

<u>/s/ Jarrett Adams</u>
Jarrett Adams, Esq.
LAW OFFICES OF JARRETT ADAMS, PLLC
40 Fulton St., Floor 28
New York, New York 10038
T: 646.880.9707
F: 646.880.9707
E: [JAdams@JarrettAdamsLaw.com](mailto:JAdams@JarrettAdamsLaw.com)
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2024, I electronically filed the foregoing pleading with the United States District Court for the Northern District of Texas using the CM/ECF system, which will automatically serve a true and complete copy upon all counsel of record.

/s/Jarrett Adams  
Jarrett Adams, Esq.